**Earl JOHNSON, et al., Plaintiffs,**

v.

**Sharon Pratt DIXON, et al., Defendants.**

**Civ. A. No. 91–1979 (TPJ).**

United States District Court,
District of Columbia.

Sept. 5, 1991.

Drew J. Fossum, Baker & Botts, Washington, D.C., for plaintiffs.

E. Louise R. Phillips, George Valentine, Office of Corp. Counsel, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

Plaintiffs Johnson, et al., four homeless men living in the District of Columbia, on behalf of themselves and others similarly situated, and the Community for Creative Non–Violence, a non-profit corporation advocating the causes of the homeless, bring this action against the District of Columbia, its Mayor, and the Director of its Department of Human Services (collectively, "the District"), to enjoin the closure of two of the public shelters the District of Columbia has heretofore maintained at its expense for people without a regular place of abode. On August 9, 1991, the Court denied plaintiffs' application for a temporary restraining order, and the shelters closed on schedule on the morning of August 11th. The matter is now before the Court on plaintiffs' motion for a preliminary injunction.

The ultimate relief sought by both the original and the first amended complaints is for a judicial declaration that the closing of the "Pierce" shelter and the "Trust Clinic" shelter at 13th and G Streets, N.E., and 14th and Q Streets, N.W., respectively, is unlawful, and for a permanent injunction ordering that they be reopened.[1] The interim relief sought by the motion for a preliminary injunction, now that the shelters have actually closed, is superficially less ambitious. If the shelters are not to be reopened *pendente lite*, plaintiffs ask that the District be ordered to provide the individual plaintiffs and their fellows with shelter amenities fully equivalent to those they enjoyed while abiding at the Pierce and Trust Clinic shelters, and to make cer-

1. Jurisdiction is predicated on 28 U.S.C. §§ 1331 and 1343(a)(3), and 42 U.S.C. § 1983.

tain they all know how to avail themselves of them.

## I.

The record before the Court shows that, at all times relevant to this case, the District has maintained the Pierce and Trust Clinic shelters pursuant to the District of Columbia Right to Overnight Shelter Act of 1984, D.C.Code §§ 3–601 *et seq.*[2] Until their closure, Pierce and Trust Clinic provided 150 and 125 beds, respectively, for adult single males, open each night from 7:00 p.m. to 7:00 a.m. to offer accommodations to those men who presented at the door while space remained available. As a practical matter, however, many—perhaps, most—of the inhabitants were "regulars" who sheltered in the same place every night for periods of weeks or months; Pierce or Trust Clinic was regarded as their "neighborhood" shelter, at which they believed themselves to be most welcome, their individual needs were known to shelter staff, and their connections with ancillary social support services, *e.g.*, health care, public assistance, and substance-abuse programs, were maintained. The shelters were operated by private non-profit concerns under contract with the District: Trust Clinic by Associated Catholic Charities of the Archdiocese of Washington, and Pierce by the Coalition for the Homeless, Inc.

The District's budget for fiscal 1992, commencing October 1st, drastically reduces the allocation of funds to operate its public shelter system: from $21 million in 1991 to $11.7 million the following year. Confronted thus with the economic necessity of closing some shelters, Earnest C. Taylor, the Chief of the District's Office of Emergency Shelter and Support Services, D.C. Department of Human Services, settled upon Pierce and Trust Clinic shelters as the first to go. They were, he concluded, in the poorest state of repair, and they were located in the City's wards (Wards 6 and 2, respectively) having the highest concentrations of homeless shelters generally,

both public and private. Taylor's decision was approved by his superiors.

In mid-June, 1991, Taylor notified the private contractors operating Pierce and Trust Clinic that their shelters would be closed by the end of September, directed that they begin preparation to close at once, and promised 30 days' notice in advance of the actual shutdown date. The inhabitants of Pierce and Trust Clinic were likewise informed by written notices, some delivered personally, and posted at the shelters. On July 8, 1991, both contractors were advised in writing that their contracts would terminate, and the shelters close, as of August 10, 1991, as they eventually did. This action, together with its prayer for emergency *pendente lite* relief, was filed August 7th.

## II.

The availability of the preliminary injunctive relief the plaintiffs seek is governed by the familiar four factors: the irreparability of the harm to befall them if an injunction does not issue; the degree of likelihood that they will eventually prevail on the merits; the extent to which an injunction would impose an inequitable hardship on the District; and the direction in which the public interest points. *See Washington Metropolitan Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841 (D.C.Cir. 1977); *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925–26 (D.C.Cir. 1958).

The Court credits the plaintiffs' evidence as showing that numerous former denizens of Pierce and Trust Clinic shelters are now (or believe themselves to be) without a place of abode, at least one with comparable amenities, and that they are currently living and sleeping, literally, out-of-doors in the District of Columbia. The Court also accepts, for purposes of the current motion, plaintiffs' evidence to the effect that a substantial (although undetermined) proportion of the former populations of the

**2.** As of August 1, 1991, the District maintained    23 public shelters for the homeless of both sexes

two shelters are mentally ill,[3] and are thus "handicapped" as that term is used in various statutes prohibiting discrimination against such persons. Many also have other chronic illnesses or infirmities that would similarly be regarded as handicapping.

The principal issue upon which this motion turns, even at this early juncture, however, is whether the complaint states any claim under federal law upon which relief could be granted. The issue bears directly on whether plaintiffs will succeed on the merits.[4]

### III.

Count Four of the complaint alleges that the District's decision to close the two shelters violates plaintiffs' rights under the Due Process Clause of the Fifth Amendment to the U.S. Constitution. In essence, they claim that the homeless men who were the regular inhabitants of the Trust Clinic and Pierce shelters had acquired a property right in the nature of an "entitlement" to continue to reside there until accorded "due process of law" which, in these circumstances, would have required individual notices of an intent to evict them and a hearing as to the validity of the District's reasons for doing so.

In support of such a right plaintiffs cite the case of *Williams v. Barry*, 490 F.Supp. 941 (D.D.C.1980), in which, over a decade ago, another judge of this district court preliminarily enjoined the total shutdown of what was then a largely *ad hoc* shelter system for homeless males in the District

of Columbia. The district court held that the District's maintenance of shelters, upon which the homeless men had over time come to rely, had resulted in the formation of a *de facto* entitlement of sorts, *see Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), requiring that notice of the decision to close the shelters, and a hearing for those aggrieved, were constitutionally required.[5]

Since *Williams v. Barry* was decided, however, political forces have worked a sea change in the law. In 1984, "adequate overnight shelter" was declared to be a *statutory* legal right of "all persons in the District of Columbia" by the electorate who enacted it into law by referendum as the original District of Columbia Emergency Overnight Shelter Act of 1984, D.C.Code, §§ 3–601 *et seq*. The right was then withdrawn as such, five years later, by the voters' elected representatives. In 1990, the Council of the District of Columbia passed the Emergency Overnight Shelter Amendment Act of 1990, amending the statute in multiple respects. The amendment establishes a comprehensive, but limited, program of shelter services for certain eligible persons, upon various terms and conditions, but it also expressly declares that nothing therein is to be construed to create an "entitlement" to shelter for anyone. D.C.Code § 3–609.[6] Thus, to the extent the Due Process Clause of the Fifth Amendment and *Williams v. Barry* might at one time have betokened a federal cause of action for these plaintiffs had matters remained in *status quo*, they do so no longer.

having a total capacity of 1,770 beds.

**3.** Estimates range between 30 and 90 percent, with or without complications of alcohol or drug abuse.

**4.** Two of the four counts of the complaint assert claims under local law: the District of Columbia Hospitalization of the Mentally Ill Act, D.C.Code §§ 21–501, *et seq*., (Count Two), and Chapter 25 of Title 29, D.C. Municipal Regulations, governing the operation of emergency overnight shelter system (Count Three), as to which this Court's jurisdiction could only be "supplemental." *See* 28 U.S.C. § 1367.

**5.** When the merits were decided, however, the district court found that due process had been

satisfied by the District's having given the inhabitants written notice that closure of the shelters was proposed, and afforded them an opportunity to submit written objections in advance of the final decision. *Williams v. Barry*, Civ. No. 80–1104, mem. op. (D.D.C. June 8, 1982). No adjudicatory hearing, nor a statement of reasons, was necessary. The court of appeals affirmed in *Williams v. Barry*, 708 F.2d 789 (D.C.Cir. 1983).

**6.** It also prescribes an exclusive avenue for review of decisions denying or terminating such services within the District's own judicial system. D.C.Code § 3–606(a).

## IV.

■ The other provision of federal law invoked by plaintiffs as conferring a substantive right, and thus serving as a source of jurisdiction here, is found in Count One of their complaint which alleges that the District's decision to close its Pierce and Trust Clinic shelters violates a provision of the federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, (hereinafter the "Act"). The Act states, in relevant part:

it shall be unlawful to discriminate in the sale, or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

a) that buyer or renter

b) a person residing in or intending to reside in that dwelling after it is so sold, rented or made available or;

c) any person associated with that buyer or renter.

42 U.S.C. § 3604(f)(1). The definition of the "handicapped" under the Act includes those who are mentally impaired, those perceived by others to be mentally impaired, and those infected with the AIDS virus (although excluding those whose conditions are due to "current illegal use or addiction to controlled substances"). 42 U.S.C. § 3602(h). The Act then defines "discrimination" against the handicapped to include, *inter alia,*

b) a refusal to make reasonable accommodation in rules, policies, practices, or services, when such accommodations may be necessary to afford such persons equal opportunity to use and enjoy a dwelling....

42 U.S.C. § 3604(f)(3)(B).[7]

Plaintiffs contend that a substantial proportion of the inhabitants of the Pierce and Trust Clinic Shelters are handicapped with-

in the meaning of the Act, perhaps a majority if recovering alcoholics and drug abusers are numbered among them. Thus, they argue, the closure of the shelters represents unlawful discrimination against the handicapped.

At the outset, the Court observes that the applicability of the Fair Housing Act to the circumstances of this case is questionable. The Act, in terms, protects only "buyers" and "renters" from unlawful discrimination. Plaintiffs, and the other inhabitants of the two shelters, are neither. Such accommodations as they have had at the shelters in the past have been provided *gratis* by the District. It is, moreover, doubtful if "emergency overnight shelter," as the District conceives itself to be providing, *i.e.*, a place of overnight repose and safety for persons whose only alternative is to sleep in alleys or doorways, can be characterized as a "dwelling" within the meaning of the Act, even if it may seem like home to them.[8]

Assuming, without deciding, however, that the antidiscrimination provisions of the Act do apply in the context of shelters for the homeless, the Court must determine whether plaintiffs have a reasonable likelihood of succeeding to prove the allegation of their first amended complaint, that the District of Columbia acted with discriminatory purpose in closing the Pierce and Trust Clinic shelters.

In paragraph 28 of their first amended complaint, plaintiffs charge that the District's decision was "motivated entirely or in part by the neighborhood opposition to those shelters." That opposition, they continue, is based "in whole or in part ... on discriminatory objectives," *i.e.*, the mental and physical illnesses and other deficits

---

**7.** The Fair Housing Act was enacted as Title VIII of the Civil Rights Act of 1968. Sections 3604(f)(1), 3604(f)(3)(B), and 3602 were added by the Fair Housing Amendments Act of 1988.

**8.** The only case cited to the Court as holding a shelter for the homeless subject to the Fair Housing Act is *B.A.S.I.C. v. City of Providence,* No. 89–248P (D.R.I., Apr. 25, 1990), involving an around-the-clock shelter for women and fami-

lies conceded by the city of Providence to be a "dwelling" for purposes of the case.

Other federal district courts have, however, applied the Act to nursing homes for the elderly, *United States v. Commonwealth of Puerto Rico,* 764 F.Supp. 220 (D.P.R.1991) (enforcement of zoning regulation enjoined); and group homes for the mentally ill or chemically dependent, *see United States v. Village of Marshall, Wisconsin,* No. 90–C–524–S, 787 F.Supp. 872 (W.D.Wis.

constituting handicaps of the shelters' inhabitants. The District of Columbia then "capitulated," and thus "constructively adopt[ed]" the motivations of the shelters' neighbors who were hostile to their continued operation.

Such collusion between electors and their elected officials has, when proven, been held to be unlawful under the Fair Housing Act. *See, e.g., United States v. Yonkers Bd. of Educ.,* 624 F.Supp. 1276 (S.D.N.Y. 1985), *aff'd,* 837 F.2d 1181 (2d Cir.1987), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988). At the hearing of plaintiffs' motion for a preliminary injunction, however, plaintiffs conceded that they could offer no evidence of overtly discriminatory collusion. Instead, they postulated that closing the two shelters had a discriminatory "effect"—an ambient effect, at least [9]—in the "disparate impact" it had upon their former inhabitants who are handicapped within the meaning of the Act, and, thus, must be deemed unlawful irrespective of the innocent intentions of the District of Columbia officials.

According to plaintiffs, the handicapped homeless, wherever they are, will find it harder to adjust to fewer shelters, yet the District has refused to make "reasonable accommodation" in its "rules, policies [or] practices" in closing the Pierce and Trust Clinic shelters as it did. "Reasonable accommodation," in plaintiffs' view, would be such action as may be necessary to enable the handicapped inhabitants of those shelters to take up shelter life elsewhere without disrupting the continuity of those amenities to which they had become accustomed as habitual occupants of their respective "neighborhood" shelters.

The decision to close the shelters was precipitously made, plaintiffs assert, and similarly implemented. The notice plaintiffs received gave insufficient time within which to adjust. No destinations were specified for their medical records or case files. No provision was made to forward their mail (much of which consists of benefit checks, food stamp vouchers, and the like). No space was expressly set aside for them in other shelters to which they might repair. No regular transportation was scheduled to take them elsewhere where bed space would be available. And no systematic individual counselling was to be given them as to where they might go and how to go about doing it. The regular inhabitants of the Pierce and Trust Clinic shelters were, more or less, to be left to their own devices to adjust to the absence of their customary habitations. And, given their personal limitations, physical, mental, and economic, they were incapable of doing so.

The District of Columbia responds with uncontroverted evidence that none of the former inhabitants of either shelter has been or would likely be denied admittance to shelter somewhere in the system if they seek it. Bed space is available at other shelters which remain open, none of them being so distant as to represent an altogether impracticable alternative. Transportation could and would be provided as shown to be needed. Once the former inhabitants of the Pierce and Trust Clinic shelters had relocated (a process admittedly involving some minimal effort of their own), continuity of ancillary services, such as health care, individual counselling, and substance abuse programs, could and would be reestablished to the extent that the District's straitened circumstances will admit. In short, they have all so far been, or will be, "accommodated," according to their own respective limitations, and the District's.

The true tenor of the District's resistance to the relief plaintiffs seek, however, is found in the fundamental alteration, wrought by the recent legislation, in the character of such shelter services as the District henceforth intends to provide for

1991); *Oxford House–Evergreen v. City of Plainfield,* 769 F.Supp. 1329 (D.N.J.1991) (same).

**9.** The evidence at hearing, which the plaintiffs do not dispute, is to the effect that the handicapped population of the District of Columbia shelter system is more or less evenly dispersed, no higher proportion of them having frequented the Pierce and Trust Clinic shelters than the others that remain open. Thus, it cannot be said that the impact of these closures is discriminatory *as between shelters,* falling evenly, as it does, upon the afflicted and the able-bodied in proportion to their incidence in the shelter population-at-large.

all of its homeless. The District acknowledges that it will formally curtail, for the coming fiscal year and the foreseeable future, its expenditures for the provision of shelter services to the homeless. The temporary shelter that it proposes to provide them will, indeed, be little more than a short-term place of refuge after dark. Single adults will be limited generally to shelter stays of 30 days, and will no longer be permitted to take up indefinite occupancy. Beds will be made available on a "first-come-first-served" basis. Fees will be charged to persons admitted to shelters who are found to be financially able to pay them, and community service will be required of those who are not.

The legislation, in terms, declares that it contemplates only the provision of "emergency overnight shelter" to a homeless person, not a "housing accommodation." D.C.Code § 3–603(4). An "emergency" is defined as a "situation of personal or family crisis that involves an immediate or imminent threat to the health or safety of a homeless person." D.C.Code § 3–603(3).

The District offers no apology for its position, or for the plight of the homeless who receive less in the way of help than everyone, including the District, would like them to have. It must, as must all governments, ration its finite resources for social services. It has, by its elected officials, made a governmental judgment to assign the homeless a lesser priority than they may have had in the past, and it appears to have the right to do so without any judicial second-guessing, at least by the federal judiciary. As former Circuit Judge Bork said, concurring in *Williams v. Barry:*

> The Mayor is an elected official and his decision on shelters is a political one. From the beginning of judicial review it has been understood that such decisions need not be surrounded and hemmed in with judicially imposed processes. Indeed, the reasons for judges not interfering with the methods by which political decisions are arrived at are closely akin, if not identical, to the considerations un-

derlying the political question doctrine, a doctrine which denies the courts jurisdiction even to enter into certain areas.

> \*   \*   \*   \*   \*   \*

> There being no substantial constraints on the decision whether to close the shelters, that decision is a wholly political one and under no circumstances that I can imagine can there be a constitutional right to have that political judgment set about and circumscribed by procedural requirements. For the same reason, I cannot subscribe to the court's suggestion that a decision to close the shelters might in some circumstances itself be judicially reviewable.... Given our legal tradition, the suggestion that there may be judicial imposition of procedures on, and review of, plainly political decisions is revolutionary. It ought to be recognized as such, lest judges grow accustomed to the suggestion that they may control any process and begin to assume powers that clearly are not theirs.

*Williams v. Barry,* 708 F.2d at 793.[10]

In any event, insofar as plaintiffs' present entitlement to the preliminary injunction they would have the Court enter, a still older case than *Williams v. Barry,* and from another jurisdiction, is instructive. In *Metropolitan Housing Development Corp. v. Village of Arlington Heights (Ill.),* 558 F.2d 1283 (7th Cir.1977), in remanding to the district court for hearing as to whether the Fair Housing Act required a municipal zoning board to rezone property to enable the construction of low-cost minority housing to alleviate residential segregation, the Seventh Circuit articulated a four-part test for determining the availability of injunctive relief. Those four factors represent a situation-specific adaption, in a Fair Housing Act context, of the four-part test by which applications for preliminary injunctive relief are assessed generally.

---

10. *See also Joseph Skillken & Co. v. City of Toledo,* 558 F.2d 350 (6th Cir.1977), *on remand from* 429 U.S. 1068, 97 S.Ct. 800, 50 L.Ed.2d 786 (1977) (*vacating* 528 F.2d 867 (6th Cir.1975)); *Acevedo v. Nassau County, New York,* 500 F.2d 1078 (2d Cir.1974).

The questions the Seventh Circuit required the district court to answer in *Arlington Heights* were: (1) How strong is the plaintiffs' showing of discriminatory effect? (2) Is there some evidence of discriminatory intent? (3) What is the defendant's interest in taking the action complained of? and (4) Does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely restrain the defendant from interfering with individual property owners who wish to provide such housing? 558 F.2d at 1290. The Seventh Circuit then observed that, "[i]f the defendant is a governmental body acting within the ambit of legitimately derived authority, we will less readily find that its action violates the Fair Housing Act," and continued to state:

> The courts ought to be more reluctant to grant relief when the plaintiff seeks to compel the defendant to construct integrated housing or take affirmative steps to insure that integrated housing is built than when the plaintiff is attempting to build integrated housing on his own land and merely seeks to enjoin the defendant from interfering with that construction. To require a defendant to appropriate money, utilize land for a particular purpose, or take other affirmative steps toward integrated housing is a massive judicial intrusion upon private autonomy.

*Id.* at 1293.

In the instant case the answers to all four inquiries are unfavorable to the plaintiffs. They present, as previously noted, no evidence of discriminatory intent upon the part of the District of Columbia in closing the Pierce and Trust Clinic shelters, and none to show that the handicapped homeless persons are disproportionally affected in the selection of the shelters to be closed or inadequately accommodated in the manner of doing so. The District of Columbia is, moreover, a governmental body acting within the ambit of legitimately derived authority, both fiscal and legislative, and the relief sought is not merely a waiver of a regulatory requirement, but, rather, a "massive judicial intrusion" upon that governmental autonomy.

For the foregoing reasons, therefore, it is, this 5th day of September, 1991,

ORDERED, that plaintiffs' motion for a preliminary injunction is denied; and it is

FURTHER ORDERED, *sua sponte*, that a stay of the instant Order is denied; and it is

FURTHER ORDERED, that plaintiffs show cause why this case should not be dismissed pursuant to Fed.R.Civ.P. 12(h)(3) within thirty (30) days hereof, or of the completion of proceedings on any timely appeal taken herefrom.