414 Mass. 551                                                551

Williams v. Secretary of the Executive Office of Human Services.

ALBERT WILLIAMS & others[1] vs. SECRETARY OF THE
EXECUTIVE OFFICE OF HUMAN SERVICES & another[2]
(and a companion case[3]).

Suffolk. October 6, 1992. - March 11, 1993.

Present: LIACOS, C.J., ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Americans with Disabilities Act. Federal Rehabilitation Act. Fair Hous-
ing Act. Mental Health. Handicapped Persons. Housing. Constitu-
tional Law,* Equal protection of laws. *Due Process of Law,* Mental
health. *Department of Mental Health. Administrative Law,* Regula-
tions, Agency's authority.

In an action brought on behalf of certain homeless and mentally ill indi-
viduals, the plaintiffs did not demonstrate that the practices and poli-
cies of the Department of Mental Health (DMH) in allocating its re-
sources discriminated against individuals with disabilities in violation of
the provisions or regulations of the Americans with Disabilities Act, 42
U.S.C. §§ 12101 et seq., P.L. 101-336, 104 Stat. 328 (1992), or § 504
of the Federal Rehabilitation Act of 1973, 29 U.S.C. § 794 (1988), and
the DMH was entitled to summary judgment on those claims. [556-
561]

The Department of Mental Health does not violate the nondiscrimination
provisions of the Fair Housing Amendments act of 1988, 42 U.S.C.
§ 3604 (1988), by making housing referrals for its clients in accor-
dance with the implementing Federal regulations found at 24 C.F.R.
§§ 100.1 et seq. (1992), which condition availability of housing referral
services on the client's authorization to disclose active substance abuse
problems as part of the referral process. [561-564]

In an action brought on behalf of certain homeless and mentally ill indi-
viduals, differences in treatment programs administered by the Depart-

---

[1]Massachusetts Coalition for the Homeless and Mental Patients
Liberation Front, doing business as Ruby Rogers Advocacy and Drop-In
Center. A judge in the Superior Court allowed a motion to intervene
brought by Joseph Kornegay in both actions.

[2]Commissioner of Mental Health.

[3]J.S. & others vs. Secretary of the Executive Office of Human Services
& others. The Governor was dismissed as a party. See G. L. c. 231A, § 2
(1990 ed.); *Rice* v. *The Governor,* 207 Mass. 577, 580 (1911).

ment of Mental Health did not implicate Federal or State equal protection considerations where neither a suspect classification nor a fundamental interest was shown. [564-565]

In an action brought on behalf of certain homeless and mentally ill individuals, where the plaintiffs were not in involuntary custody, there was no Federal or State due process requirement that they be provided with any affirmative services by the Department of Mental Health. [565-566]

In an action brought on behalf of certain homeless and mentally ill individuals, the judge correctly allowed the motion for summary judgment of the Department of Mental Health on the plaintiff's claims of "negligent discharge" from DMH facilities. [566]

The provisions of G. L. c. 19, the enabling statute of the Department of Mental Health, do not mandate any particular method of provision of mental health services or any priority among methods, and there is no private right of action to enforce implementation of the statute, which, in any event, is subject to legislative appropriation and availability of resources. [567-570]

CIVIL ACTIONS commenced in the Superior Court Department on December 3, 1990, and June 11, 1991, respectively.

The cases were consolidated for trial and were heard by *Thomas E. Connolly*, J., on motions for summary judgment.

The Supreme Judicial Court granted a request for direct appellate review.

*Stephen H. Oleskey* (*David A. Wilson, J. Kent Wicker & Carla A. DiMare* with him) for J.S. & another.

*Steven A. Hitov* (*Ellen N. Wallace* with him) for Albert Williams & others.

*Douglas H. Wilkins*, Assistant Attorney General, (*William L. Pardee & Eleanor L. Coe*, Assistant Attorneys General, with him) for the defendants.

*Mitchell A. Kaplan & Michelle S. Wolf*, for Lawyers Clearinghouse on Homelessness & Affordable Housing, amicus curiae, submitted a brief.

*Steven J. Schwartz & Robert Fleischner*, for Coalition for the Legal Rights of the Disabled & others, amici curiae, submitted a brief.

*Bonnie Milstein* of the District of Columbia, for Mental Health Law Project, amicus curiae, submitted a brief.

ABRAMS, J. These cases present a number of issues concerning the policies and practices of the Department of Mental Health (DMH), in providing services to patients under its care, and in discharging patients. The plaintiffs contend that the DMH's policies violate (1) the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 et seq., P.L. 101-336, 104 Stat. 328 (1992); (2) § 504 of the Federal Rehabilitation Act of 1973, 29 U.S.C. § 794 (1988); (3) the Fair Housing Amendments Act of 1988 (FHAA), 42 U.S.C. § 3604(f) (1988); (4) Federal and State equal protection and due process guarantees; (5) a common law duty not to "negligently discharge" the plaintiffs into an unstable environment; or (6) the State statute governing the DMH, G. L. c. 19 (1990 ed.).

*Proceedings below.* The actions were brought on behalf of homeless and mentally ill individuals who seek to require the defendants to modify the manner in which the DMH provides services to certain patients under its care; the plaintiffs also seek to change the manner in which the DMH provides residential housing referral services and determines whether patients should be discharged.

The first complaint (J.S. complaint), filed by two former inpatients of the DMH (J.S. and D.M.), through their "next friends," the mayor of Boston, a psychiatric nurse at Boston City Hospital, and the Pine Street Inn (a corporation), was filed on December 3, 1990.

The second complaint (Williams complaint), also filed by a former inpatient of the DMH, Williams (and intervener Joseph Kornegay) (hereinafter Williams plaintiffs), and two private organizations (Massachusetts Coalition for the Homeless and Mental Patients' Liberation Front, doing business as the Ruby Rogers Advocacy Drop-In Center), was filed in June, 1991. Joseph Kornegay's motion to intervene was allowed in December, 1991. The complaints raise the same State and Federal constitutional due process and Federal Rehabilitation Act theories. The Williams complaint

554                                   414 Mass. 551

Williams *v*. Secretary of the Executive Office of Human Services.

adds a tort claim for "negligent discharge," a State statutory claim (G. L. c. 19, §§ 1 et seq.), and a claim under the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3604(f).

In January, 1992, the plaintiffs amended their complaints to include additional claims under the ADA.

The judge denied the plaintiffs' motion for certification as a class action. Pursuant to the judge's suggestion, the defendants offered a test case stipulation dated May 5, 1992. See *Barry* v. *Dymo Graphic Sys., Inc.*, 394 Mass. 830, 834-835 (1985); *Carpenter* v. *Suffolk Franklin Sav. Bank*, 370 Mass. 314, 322 (1976) (allowing test case procedure outlined in *Katz* v. *Carte Blanche Corp.*, 496 F.2d 747, 758-762 [3d Cir.], cert. denied, 419 U.S. 885 [1974]).[4]

After the close of discovery, the defendants moved for summary judgment pursuant to Mass. R. Civ. P. 56, 365 Mass. 824 (1974), on all issues. The judge allowed the defendants' motion on the Federal and State due process claims, the tort claim for "negligent discharge," the Williams plaintiffs' claims under G. L. c. 19, § 12, and the J.S. plaintiffs' claims under G. L. c. 19, § 1.

---

[4]In their stipulation, the defendants agreed to the following: (1) to waive defenses based on the statute of limitations through the date of final judgment in this case as to any subsequent plaintiff whose claim for declaratory or injunctive relief is based on the same factual elements which these plaintiffs are required to prove in order to show entitlement to relief, provided that the subsequent claimant's claim was not already barred prior to December 3, 1990; (2) to be bound by the Superior Court's judgment regarding the existence and scope of any statutory, regulatory, common law, or constitutional rights as to any subsequent similarly situated claimant; (3) to be bound by any judgment of the Superior Court regarding the legality or illegality of any practice or procedure as to any similarly situated claimant adversely affected by such practice or procedure; (4) not to argue mootness based on the plaintiffs' current situation, so long as there remains a risk that the plaintiffs might be subjected to the challenged practices, and to follow the practices outlined in *O'Sullivan* v. *Secretary of Human Servs.*, 402 Mass. 190, 192 (1988), to the extent that the conditions in that case are met; and (5) to accept the admissibility of evidence as to persons other than the named plaintiffs when relevant to prove the existence of the alleged unlawful practices or procedures that the plaintiffs claim have adversely affected them.

414 Mass. 551                                              555

Williams *v.* Secretary of the Executive Office of Human Services.

The judge denied summary judgment on the plaintiffs' ADA claims, the Rehabilitation Act claims, Williams's FHAA claims, and the J.S. plaintiffs' Federal and State equal protection claims. Each side has appealed the judge's decisions as to the issues on which the judge ruled adversely to that party on summary judgment. We granted the parties' joint application for direct and expedited appellate review. We conclude that the defendants are entitled to summary judgment on all claims, including declarations on each of the plaintiffs' claims, that the plaintiffs have failed to demonstrate the availability of relief under the ADA, the Federal Rehabilitation Act, the Fair Housing Amendments Act of 1988, Federal and State due process and equal protection guarantees, the Commonwealth's tort law on "negligent discharge," and G. L. c. 19.

*The plaintiffs.* Williams makes the following allegations. Williams currently lives in the Brighton section of Boston. He receives supplemental security income payments. He has been diagnosed as schizophrenic; he suffers from schizo-affective disorder, or an antisocial personality, as well as from temporal lobe epilepsy. Although Williams has been neither an inpatient at nor involuntarily committed to a DMH facility since he was discharged from the Massachusetts Mental Health Community Mental Health Center on November 9, 1989, he had been an inpatient at various DMH facilities prior to that date. Williams has not been hospitalized in any facility, public or private, since November 28, 1989, when he was discharged from Brigham and Women's Hospital. Williams has received medication to control his mental condition from a DMH-affiliated counseling center.

Joseph Kornegay, the intervener, is thirty-five years old; he became homeless after inpatient treatment at a DMH facility. Kornegay has been diagnosed as having a major depressive disorder and bipolar disorder; he also suffers from substance abuse (alcoholism) and an unrelated physical ailment. At the time of the complaint, Kornegay resided at the Solomon Carter Fuller Community Mental Health Center in Boston.

J.S. makes the following allegations. J.S. has borderline personality disorder and is suicidal. He has been an inpatient in various DMH facilities and did not qualify for treatment at a DMH transitional psychiatric shelter because he was deemed to be suicidal. J.S. has been an occupant of a number of shelters, including Long Island, Shattuck, and Pine Street Inn. He claims to require immediate care and continuity of services.

D.M. is thirty-one years old and is schizophrenic. He has been an intermittent resident at DMH facilities. He has been an occupant of shelters such as the Pine Street Inn, Harbor Lights, and Long Island Intake. He has repeatedly sought readmission to a DMH facility, sometimes unsuccessfully, sometimes obtaining a brief admission.

1. *Americans with Disabilities Act.* The defendants assert that the judge erred in denying their motion for summary judgment on the issue of the validity of the DMH's structure and practices under the ADA, 42 U.S.C. §§ 12101 et seq. We agree.

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The plaintiffs articulate a theory under 28 C.F.R. § 35.130(d) (1992) (requiring that "public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities"). The plaintiffs argue that the DMH has not provided a sufficient amount of integrated supported housing to satisfy the requirements of the ADA.

The plaintiffs' argument fails, in that nothing in the ADA requires that a specific proportion of housing placements provided by a public mental health service be in "integrated" housing.[5] Nor does anything in the ADA or its "integration

---

[5]Neither the ADA nor its regulations provide any method of determining what an "integrated setting" is or would consist of in the context of a

regulations" address the absence of sufficient integrated residential placements to satisfy the entire demand for such services. Federal courts have rejected the argument that analogous discrimination provisions of the Rehabilitation Act require a State to furnish specific services. See *Clark* v. *Cohen,* 613 F. Supp. 684 (D. Pa. 1985), aff'd, 794 F.2d 79 (3d Cir. 1986), cert. denied, 479 U.S. 962 (1986) (§ 504 of Federal Rehabilitation Act imposes no affirmative obligations on States to furnish services). See also *Alexander* v. *Choate,* 469 U.S. 287, 306-309 (1985) (rejecting as unworkable theory that Federal Rehabilitation Act restricts State discretion in choosing proper mix of amount, scope, and durational limitations on State-funded services, or requires State always to make broad-based distributive decisions in way most favorable, or least disadvantageous, to the handicapped). Nor does a health care provider discriminate when it fails to develop greater capacity or expertise to treat disabilities, under the Federal Rehabilitation Act. *Ciampa* v. *Massachusetts Rehabilitation Comm'n,* 718 F.2d 1, 5 (1st Cir. 1983). The same considerations apply in construing the ADA. Although we recognize that deinstitutionalization with subsequent services may be highly desirable for individuals in the plaintiffs' position, such services are not required as a matter of law by the ADA. See, e.g., *Phillips* v. *Thompson,* 715 F.2d 365, 368 (7th Cir. 1983).

As support for their argument that the DMH has violated the ADA by operating a residential services system that segregates the disabled from the nondisabled without medical necessity to do so, the plaintiffs assert that, in order to obtain DMH housing services, nearly sixty-five per cent of those to whom the DMH offers housing services must accept housing in residences that are occupied only by other individuals with disabilities. The plaintiffs' use of a system-wide percentage of DMH clients in housing occupied by other in-

---

treatment system for the mentally ill. Currently there are no guidelines on whether a State mental health system has satisfactorily established the "most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (1992).

dividuals with disabilities as proof of their claim ignores the fact that the ADA does not mandate particular system-wide percentages for allocations of community placements. Further, the plaintiffs' figures did not show that any particular client's placement was inappropriate, or that they themselves were inappropriately placed in a segregated setting after the ADA's effective date. See 28 C.F.R. § 35.130(d) (1992) ("A public entity shall administer services . . . in the most integrated setting appropriate to the needs of qualified individuals with disabilities"). A mere percentage, standing alone, does not establish a presumption of inappropriate placement. Finally, any interpretation of the ADA must consider the same practicalities that the United States Supreme Court acknowledged in its examination of the Federal Rehabilitation Act. See, e.g., *Alexander* v. *Choate*, 469 U.S. 287, 299 (1985) (although Court will give effect to statutory objectives of Act, Court must still consider desire to keep effect of Act within manageable bounds).

The plaintiffs argue for a strict integration requirement under 42 U.S.C. § 12182 (prohibition of discrimination by public accommodations). That section, however, applies to private entities. Even if § 12182 were not limited to private entities, see 42 U.S.C. § 12181(7) (focusing on private entities providing accommodations open to the general public), the effect of this section of the ADA is governed by the same considerations as set forth above. The plaintiffs have neither alleged nor proved that DMH resource allocation decisions are made on the basis of disability in a discriminatory fashion.

The plaintiffs further argue that the DMH unlawfully discriminates against individuals who suffer from a combination of mental disabilities and substance abuse (alcoholism) (dual diagnoses) in the operation of the DMH's community residential services; the plaintiffs contend that the DMH's policies result in dual-diagnosed individuals being disproportionately denied residential placements, and in a concomitantly high ratio of discharges of dual-diagnosed individuals to streets and to shelters. However, an agency does not obligate

414 Mass. 551                                          559

Williams *v.* Secretary of the Executive Office of Human Services.

itself to make services available to persons with different or complicating disabilities simply by treating individuals with a single disability. See, e.g., *Traynor* v. *Turnage*, 485 U.S. 535, 549 (1988) (Federal Rehabilitation Act does not require any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons). ADA regulations expressly provide that the ADA does not prohibit "a public entity from providing benefits, services, or advantages to individuals with disabilities or to a particular class of individuals with disabilities, beyond those required by this part." 28 C.F.R. § 35.130(c) (1992).

The United States Department of Justice, in promulgating this regulation, stated that "paragraph (c) has been revised to clarify that State and local governments may provide special benefits, beyond those required by the nondiscrimination requirements of this part, that are limited to individuals with disabilities, without thereby incurring additional obligations to persons without disabilities or to other classes of individuals with disabilities." 56 Fed. Reg. 35,705 (1991).

The focus of Federal disability discrimination statutes is to address discrimination in relation to nondisabled persons, rather than to eliminate all differences in levels or proportions of resources allocated and services provided to individuals with differing types of disabilities. See *Traynor* v. *Turnage*, *supra* at 548 (central purpose of Rehabilitation Act "is to assure that handicapped individuals receive 'evenhanded treatment' in relation to nonhandicapped individuals"). In other words, the purpose of the ADA is to provide an equal opportunity for disabled citizens. The services that the DMH already provides are not required by Federal antidiscrimination statutes. If the ADA carried with it the mandate the plaintiffs would require, then the DMH, in providing any service for any group of the mentally disabled, would be required to provide the same services to other individuals with different mental disabilities. Nothing in the language of the ADA indicates that Congress intended that result.

The provisions of Title II of the ADA extend only to persons who are qualified individuals with disabilities; under 42 U.S.C. § 12131 (2), a qualified individual with a disability is one who "with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." Courts do not determine whether an agency's allocation of resources or provision of services is efficient or in proportion to the obvious and pressing need of the disabled within the Commonwealth. On this record,[6] the plaintiffs have not shown that

---

[6]A test case stipulation is not the same as a typical class action. The results of the test case do not bind any plaintiffs bringing actions against the DMH except the plaintiffs in the test case. See *Carpenter* v. *Suffolk Franklin Sav. Bank*, 370 Mass. 314 (1976); *Katz* v. *Carte Blanche Corp.*, 496 F.2d 747, 761-762 (3d Cir.), cert. denied, 419 U.S. 885 (1974). Cf. note 4, *supra.*

For the most part, these plaintiffs argue for community housing with associated services provided by the DMH. There is no evidence in the record that such community placements are available. The plaintiffs' argument and statistical support that greater use of community placements would be cost effective does not affect the legal issue.

Williams has been diagnosed as schizophrenic and bipolar. He has an *antisocial* personality as well as temporal lobe epilepsy. He has difficulty regulating his medication. Williams complains that he has been unable to afford stable, independent living arrangements, which he alleges would help him avoid some of the problems associated with his antisocial personality. As we read the record, it is unclear whether Williams desires his own apartment or community housing.

Kornegay became homeless while an inpatient at Solomon Carter Fuller Community Mental Health Center. He suffers from bipolar disorder and has been *suicidal.* He has a substance abuse problem (alcoholism).

D.M. is schizophrenic and repeatedly has experienced psychotic episodes. He has been committed to DMH inpatient facilities at least twenty-six times. His 1990 application for placement in a DMH residential program was denied. He was not sufficiently functional to qualify for a DMH shelter program. D.M. was admitted to a DMH inpatient unit in 1990 because he was "psychotic and unable to care for himself." The admitting physician observed that D.M. was paranoid and confused, and that D.M. reported auditory hallucinations.

J.S. has a borderline personality disorder and is *suicidal.* He has been an inpatient at DMH facilities on numerous occasions since 1974. He was

414 Mass. 551                                      561

Williams *v.* Secretary of the Executive Office of Human Services.

the practices and policies of the DMH discriminate against these individuals with disabilities in violation of the provisions or regulations of the Americans with Disabilities Act or the Federal Rehabilitation Act.

The plaintiffs point to programs outside the Commonwealth as models for the methods by which the DMH could provide services to the individuals with dual diagnoses; however, the ADA does not require the DMH to change the structure of its services or funding to conform to other programs that the plaintiffs claim are more efficient.[7]

2. *Fair Housing Act.* The plaintiffs assert that the DMH violates the Fair Housing Amendments Act of 1988 (FHAA), 42 U.S.C. § 3604(f) (1988), by refusing to refer dual-diagnosed individuals to some independent living situations if those clients refuse to authorize the disclosure of their recent involvement with substance abuse (alcohol).

The defendants agree that the DMH actively makes housing referrals to private apartments for its clients when appropriate. The DMH refers clients to the Massachusetts Housing Finance Agency (MHFA) units that are set aside for mentally disabled clients of DMH; pursuant to the referral agreement, DMH clients who have current or recent histories of substance abuse — including alcohol abuse — must actively be engaged in treatment to be considered eligible for the referral program. The DMH asks clients for permission to disclose active substance abuse problems as part of the referral process; a client with recent substance abuse difficul-

---

denied admission to a facility because that facility does not accept people with suicidal tendencies.

There is no factual dispute as to these plaintiffs' conditions. In view of the multiplicity of their problems, we cannot say on this record that denial of placement in community residential programs was error. We conclude that summary judgment on this issue, against these plaintiffs, is appropriate.

[7]The plaintiffs repeatedly point to Wisconsin's mental health services system as a model of an efficient and practical structure for providing care to the mentally ill. That another State, through legislation, allegedly applies its resources more effectively is an argument better made to the Legislature, not to the courts.

ties who does not authorize disclosure cannot be referred under the agreement.

The Williams plaintiffs rely on 42 U.S.C. § 3604(f)(2)[8] and its implementing regulations for the proposition that the DMH may not be a party to such an agreement with the MHFA. We do not agree. The United States Department of Housing and Urban Development (HUD) has implemented 42 U.S.C. § 3604(f)(2) at 24 C.F.R. §§ 100.1 et seq. (1992). HUD provides, in 24 C.F.R. § 100.70(a), that "[i]t shall be unlawful, because of . . . handicap . . . to restrict or attempt to restrict the choices of a person by word or conduct in connection with seeking, negotiating for . . . or renting a dwelling so as to . . . discourage or obstruct choices in a community, neighborhood or development."

Section 100.202(c) of HUD's regulations declares that "[i]t shall be unlawful to make an inquiry to determine whether an applicant for a dwelling, . . . has a handicap or to make inquiry as to the nature or severity of a handicap of such a person." There are exceptions, as follows: "[T]his paragraph does not prohibit the following inquiries, provided these inquiries are made of all applicants, whether or not they have handicaps: (1) Inquiry into an applicant's ability to meet the requirements of ownership or tenancy; (2) Inquiry to determine whether an applicant is qualified for a dwelling available only to persons with handicaps or to persons with a particular type of handicap; (3) Inquiry to determine whether an applicant for a dwelling is qualified for a priority available to persons with handicaps or to persons with a particular type of handicap; (4) Inquiring whether an applicant for a dwelling is a current illegal abuser or addict of a controlled substance . . . ." 24 C.F.R. § 100.202 (c). The

---

[8]Title 42 U.S.C. §3604(f)(2) provides, in pertinent part, that it shall be unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of — (A) that person; or (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or (C) any person associated with that person."

414 Mass. 551                                             563

Williams *v.* Secretary of the Executive Office of Human Services.

DMH's agreement with the MHFA implicates all of the concerns addressed by the above exceptions. Active, untreated substance abuse, including alcohol abuse, may affect the ability of a mentally disabled individual to meet the requirements of tenancy under § 100.202(c)(1). Disclosing that a potential tenant is qualified for the dwellings set aside for DMH clients, and that the tenant is a person with a particular type of handicap as determined by the DMH, is permitted under § 100.202(c)(2), (3). To the extent that the DMH client abuses controlled or illegal substances, § 100.202(c)(4) is applicable.

The analysis whether the DMH must provide referral services for all its clients to all residential settings, including settings that are not equipped to manage mental illness complicated by an active substance abuse problem, is analogous to that involved in examining the dual-diagnoses issue under the ADA, above. See *supra.* That the DMH distinguishes clients who are simply mentally disabled from those with a dual diagnosis in the DMH's own housing referral services, by conditioning the availability of those housing referral services on authorization to disclose substance abuse problems, serves a legitimate interest of the DMH and its clients; a blanket requirement that the DMH withhold all relevant information about potential tenants from MHFA landlords would, in all likelihood, precipitate a substantial decrease in participation in the housing set-aside program.

We have recognized the importance to a prospective landlord of information about a DMH-referred tenant in *Onofrio* v. *Department of Mental Health,* 408 Mass. 605, 613 (1990), *S.C.,* 411 Mass. 657 (1992), wherein we held that the DMH has a duty to provide a landlord "with sufficient information [about a DMH client] to enable [the landlord] to protect his property." *Id.* at 610. That the legitimate conditions of a DMH service may cause that service to be more readily available to individuals with one type of disability than to those with another does not change this conclusion. See, e.g., *Johnson* v. *Dixon,* 786 F.Supp. 1, 4-7 (D.D.C. 1991) (judicial determination of degree to which a govern-

mental body must provide for homeless and mentally ill would constitute "massive judicial intrusion" on legitimately derived governmental authority). There is no requirement that the DMH give absolute priority to its most difficult clients.

3. *Federal and State equal protection claims.* The defendants assert that the judge erred in denying their motion for summary judgment on the issue of Federal and State equal protection. We agree.

The plaintiffs argue that the DMH discriminates against "the homeless mentally ill on the basis of: (1) their homelessness; and (2) the characterization of [the plaintiffs'] behavior and mental illness as 'treatment resistant.'" The plaintiffs argue that this court should adopt a heightened scrutiny standard under both the Federal and State Constitutions in examining the DMH's actions as to the plaintiffs. Even if this court declines to adopt such a standard, the plaintiffs argue, the DMH's actions would fail even a "rational basis" equal protection review.

There is neither a suspect classification, *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432 (1985) (classification based on mental illness receives "rational basis" level of scrutiny), nor a fundamental interest at stake here. The plaintiffs cannot show that they have been mistreated by the defendants because of membership in a class. The plaintiffs acknowledge that they and other mentally ill persons have received services; the DMH introduced evidence showing that the seriously mentally ill receive almost all the DMH-funded inpatient and community residence services, as well as many outpatient services, including the Homeless Outreach Team (HOT). A mental health agency may constitutionally provide differential services and treatment. *Commonwealth v. Davis*, 407 Mass. 47, 51 (1990), quoting *Doe v. Gaughan*, 808 F.2d 871, 881 (1st Cir. 1986), citing *Woe v. Cuomo*, 729 F.2d 96, 103 (2d Cir. 1984), cert. denied, 469 U.S. 936 (1985) ("There is no constitutional requirement . . . that all mental patients in State-run hospitals receive the same rights or care"). The plaintiffs have failed to

414 Mass. 551                                            565

Williams *v.* Secretary of the Executive Office of Human Services.

demonstrate that the defendants have taken discriminatory action against them based on their membership in a "class" of "homeless" or "treatment resistant" individuals. Further, there is no fundamental right to receive services of the nature that the plaintiffs desire from the Commonwealth. That the DMH provides fewer services to individuals who resist those services — and who have a right competently to reject those services, see *Rogers* v. *Commissioner of the Dep't of Mental Health*, 390 Mass. 489 (1983); 104 Code Mass. Regs. § 3.10(2) (1988) — is not surprising; the DMH is not required to devote greater resources to the "treatment resistant" portion of the its client population.[9]

4. *Federal and State due process claims.* The plaintiffs contend that the judge erred in granting the defendants' motion for summary judgment on the issue of Federal and State due process. We disagree.

In *Youngberg* v. *Romeo*, 457 U.S. 307, 318-319 (1982), the Supreme Court held that the due process clause of the Federal Constitution requires that "minimally adequate care and treatment" be provided for persons held involuntarily by the State, and required that decisions about the care of involuntary inpatients be made according to "accepted professional judgment." *Id.* at 323. Under the United States Constitution, the State has no affirmative duty to provide services absent custody. *DeShaney* v. *Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 196 (1989) (State not liable for injuries resulting from release of abused boy to abusive father's custody). Nor do Federal courts recognize a due process right to community placement for the mentally ill except to remedy a wrong during custody. See, e.g., *Lelsz* v. *Kavanagh*, 807 F.2d 1243, 1247-1250 (5th Cir.), cert. dismissed sub nom. *Association for Retarded Citizens* v. *Kavanagh*, 483 U.S. 1057 (1987). The plaintiffs' argument that the Constitution requires the State to provide services when there

---

[9]That the plaintiffs characterize "treatment resistance" as a product of a mental disability does not alter the DMH's ability to make decisions as to whether to apply resources to overcome the clients' resistance.

is a "special relationship" between the State and the plaintiff was also rejected in *DeShaney, supra* at 198. See *Monahan v. Dorchester Counseling Ctr., Inc.,* 961 F.2d 987, 990-991 (1st Cir. 1992). There is therefore no right to follow-up care for the homeless mentally ill under the Federal Constitution.

Although we have been skeptical of the narrow interpretation of due process in the context of the mentally ill, *Matter of McKnight,* 406 Mass. 787, 799-800 nn.11, 12 (1990), and of the idea that the State Constitution never requires affirmative aid, *id.* at 800, a holding that the Massachusetts Declaration of Rights requires the provision of postdischarge services or particular residential placements would represent an enormous and unwarranted extension of the judiciary into the DMH's authority. We affirm the allowance of the defendants' motion for summary judgment on the issue of Federal and State due process.

5. *Tort claim for negligent discharge.* The plaintiffs contend that the judge erred in allowing the defendants' motion for summary judgment on the plaintiffs' claim of "negligent discharge." We affirm the judge's allowance of the defendants' motion.

The plaintiffs presented no evidence to the judge that at the time of their discharge from DMH facilities their discharge was in any way negligent. Although the plaintiffs may be entirely correct in their assertion that providing various postdischarge services and restructuring the DMH's housing services would benefit them, such an argument departs from the theory of "negligent discharge"; the plaintiffs' argument is that the defendants, the Secretary of the Executive Office of Human Services and Commissioner of the DMH, have failed to allocate resources to fund follow-up services for the plaintiffs and to provide the plaintiffs with stable postdischarge environments. The judge correctly characterized the plaintiffs' claim as one for misallocation of resources and therefore not within judicial authority. The allowance of the defendants' motion for summary judgment was correct.

414 Mass. 551                                567

Williams *v.* Secretary of the Executive Office of Human Services.

6. *DMH enabling statute — G. L. c. 19.* The plaintiffs complain that the provisions of the DMH's enabling statute, G. L. c. 19, require the DMH to provide specific services to the plaintiffs. The plaintiffs also argue that the judge erred in concluding that there is no private right of action to enforce the provisions of G. L. c. 19, § 12, and in granting summary judgment to the defendants on this point. The plaintiffs assert that G. L. c. 231A, § 2 (1990 ed.), provides the necessary cause of action to challenge the defendants' alleged failure to comply with G. L. c. 19 and c. 123 (1990 ed.), and the regulations promulgated thereunder.[10]

A. *G. L. c. 19, § 1.* J.S. and D.M. contend that the judge erred in granting summary judgment for the defendants on the plaintiffs' claim that G. L. c. 19, § 1, which in relevant part provides that the DMH shall "take cognizance of all matters affecting the mental health of the citizens of the commonwealth," and that "the primary mission of the [DMH] shall be to provide for services to citizens with long-term or serious mental illness, early and ongoing treatment for mental illness, and research into the causes of mental illness," requires that the DMH grant absolute priority to services to the seriously mentally ill. This requirement, the plaintiffs allege, mandates that the DMH provide specific services to its clients. We disagree.

The plain language of the statute elucidates three facets of the DMH's primary mission, but does not indicate any particular priority to be given to any one aspect of the DMH's primary mission. It is within the discretion of the agency to determine priorities for allocation of resources among services where the enabling statute does not itself clearly establish particular priorities. Therefore, it is for the DMH to decide the manner in which it will carry out the responsibilities delegated to it by the Legislature. We affirm the judge's al-

---

[10]General Laws c. 231A, § 2, is an appropriate route by which to challenge an administrative agency's noncompliance with its statutory mandate. *Villages Dev. Co.* v. *Secretary of the Executive Office of Envtl. Affairs*, 410 Mass. 100, 105-106 (1991).

lowance of the defendants' motion for summary judgment on this issue.

B. *G. L. c. 19, § 12.* Williams and Kornegay contend that the defendants have not complied with the mandate of G. L. c. 19, § 12, or its implementing regulations, and that the judge erred in granting summary judgment for the defendants on this point. We disagree.

Section 12 provides that the DMH "shall establish a comprehensive program of community mental health services . . . and to promote [such a program] the department shall divide the commonwealth into service areas for the conduct of said mental health services, and shall establish standards for the development of said community programs." Section 12 further provides that "[e]ach area shall be drawn so as to include and to allow for the development of mental health services and facilities, as needed, which shall be readily accessible to the people in the area, taking into consideration such factors as geographic boundaries, roads and other means of transportation, population concentration, city, town and county lines, other relevant community services, and community economic and social relationships."

Williams argues that the first part of § 12 mandates the establishment of a comprehensive system of mental health services, and that these services be delivered through service areas. The second part of § 12, Williams contends, establishes standards for the creation and operation of those service areas. Williams points to a number of aspects of the metropolitan Boston (Metro Boston) service area that allegedly demonstrate a clear failure to satisfy the DMH's statutory mandate, including Metro Boston's level of funding for specific services, and a comparison of Metro Boston's level of funding and level of need with that of other service areas. That Metro Boston's need for services exceeds the level of funding provided, Williams maintains, demonstrates that Metro Boston is underfunded relative to the other DMH service areas, and that the DMH has failed to satisfy its statutory mandate. Williams also focuses on the DMH's regulations, asserting that its failure to provide services to Williams

allegedly required by 104 Code Mass. Regs. § 16.03 (2) (c)[11] and § 16.07 (1) (d) (1988)[12] demonstrates the DMH's failure to satisfy its own regulations.

The defendants assert that provision of services is subject to appropriation and availability of resources. G. L. c. 19, § 16 ("[t]he department shall develop and maintain, subject to appropriation . . . a comprehensive, area-based system to provide community mental health services"). 104 Code Mass. Regs. § 16.01 (4)[13] and § 21.01 (1) (c) (1988). Availability of funding, the DMH asserts, is a condition for the effect of any individual regulation. 104 Code Mass. Regs. § 16.01 (4) ("The full implementation of provisions in these regulations . . . is subject to the availability of the resources that are required for such implementation").

The crux of Williams's argument is that G. L. c. 19, § 12, requires that the DMH allocate resources by the priorities

---

[11]"An individual shall be referred for, and shall be eligible for, case management, a comprehensive assessment and an [individual service plan] pursuant to the procedures established by these regulations, 104 [Code Mass. Regs.] § 16.00, whenever the individual is admitted to and is a resident of an inpatient facility for the mentally ill pursuant to the provisions of M.G.L. c. 123, §§ 7, 8, 10, 11, 12, 15, 16 or 18, provided that a person need not be so referred if he or she is at such an inpatient facility for purposes of short-term evaluation or observation under the provisions of said [§§] 15, 16 or 18 and has not been identified as Medically Involved."

[12]"A mental health inpatient facility shall refer a client for case management, comprehensive assessment and an [individual service plan] if the individual is admitted" under the same conditions specified in 104 Code Mass. Regs. § 16.03 (2) (c), note 11, *supra.*

[13]"*Availability of Resources.* The full implementation of provisions in these regulations, 104 [Code Mass. Regs.] § 16.00, for service planning (including, but not limited to, the performance of preliminary assessments and comprehensive assessments and the development of individual service plans and program specific treatment plans), for other case management services, and for services pursuant to such service planning and case management is subject to the availability of the resources that are required for such implementation. To the extent that resources are insufficient for such full implementation in an Area or in a program, the provisions of these regulations shall be implemented to the fullest extent possible subject to the requirement established by 104 [Code Mass. Regs.] § 16.06 (2) that available resources shall be allocated by the Area Director or designee according to the severity of client needs."

proffered by Williams. Section 12 does not establish guidelines restricting the DMH's efforts at providing services within its mandate to those argued for by the plaintiffs. Rather, § 12 focuses on the general geographic necessities of the DMH's service areas, mandating that the service areas be drawn "so as to include . . . mental health services and facilities, as needed, which shall be readily accessible to the people in the area," and to consider the factors that would enable people to get to the facilities. Section 12 does not establish a specific mandate requiring the DMH to provide services of the nature, or in the manner, sought by the plaintiffs. Where the Legislature has not imposed specific restrictions on the reasonable methods by which an agency may carry out its mandate in the plain language of the agency's enabling statute, it is not appropriate for the courts to order the agency to follow specific methods for meeting the agency's mandate. See, e.g., *Matter of McKnight*, 406 Mass. 787, 792 (1990) ("[w]here the means of fulfilling [a legal] obligation is within the discretion of a public agency, the courts normally have no right to tell that agency how to fulfil its obligation. . . . Only when . . . there is but one way in which that obligation may properly be fulfilled, is a judge warranted in telling a public agency precisely how it must fulfil its legal obligations"); *Attorney Gen.* v. *Sheriff of Suffolk County*, 394 Mass. 624, 630 (1985) ("where the means of carrying out [a] statutory duty is within the discretion of the public official, courts normally will not direct how the public official should exercise that statutory duty"); *Bradley* v. *Commissioner of Mental Health*, 386 Mass. 363, 365 (1982). We affirm the judge's allowance of the defendants' motion for summary judgment.

*Conclusion.* In declaratory actions, even where relief is denied, the rights of the parties must be declared. See *Attorney Gen.* v. *Kenco Optics, Inc.*, 369 Mass. 412, 418 (1976). The case is remanded to the Superior Court. On remand, a judgment shall enter declaring that the DMH's policies as to these plaintiffs do not violate the ADA, the Federal Rehabilitation Act, the Fair Housing Amendments Act of 1988, Fed-

eral and State due process and equal protection guarantees, the Commonwealth's tort law on "negligent discharge," and G. L. c. 19, and ordering judgment for the defendants on all the claims advanced by the plaintiffs.

*So ordered.*